IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Marcia S. Krieger

Civil Action No. 18-cv-01844-MSK-SKC

STEPHEN MANNAN,

    Plaintiff,

v.

THE STATE OF COLORADO,

    Defendant.

---

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court pursuant to the Defendants' ("CDOC") Motion for Summary Judgment **(# 35)**, Mr. Mannan's response **(# 38)**, and CDOC's reply **(# 43)**; and CDOC's Motion to Exclude the Testimony of Sherry Young **(# 34)**, Mr. Mannan's response **(#39)**, and CDOC's reply **(# 41)**.

## FACTS

The Court briefly summarizes the pertinent facts here, and elaborates as necessary in its analysis.

Since 2013, Mr. Mannan has been employed by CDOC as a Corrections Officer, assigned to the Denver Diagnostic and Reception Center ("DRDC"). Corrections Officers are responsible for a wide range of tasks relating to the operation of a prison, serving in a variety of "posts." Posts can include assignment to an inmate housing unit, the recreation yard, control rooms, perimeters and towers, and so on. Corrections Officers regularly rotate through the various posts

over a period of time. Thus, Warden Justin Long's affidavit explains that, due to staffing obligations, it is important that all Corrections Officers be able to perform the duties of all possible posts.

Many of these posts require the Corrections Officer to engage in lengthy periods of standing and walking, climbing and descending stairs, and occasional periods of bending and stooping; a handful of posts offer more (but not exclusively) sedentary work. In addition, all posts have the potential of requiring a Corrections Officer to deal with altercations between inmates or between inmates and stuff. Indeed, all Corrections Officers are required to take and pass a self-defense/physical control tactics class annually. Mr. Long's affidavit makes clear that "[a]n individual who is not [self-defense/control tactics] certified cannot work as a DRDC Correctional Officer, even on a temporary basis." Thus, it is clear that an essential function of the Corrections Officer position, regardless of posting, is having the physical capability to intervene and/or defend one's self and others.

Mr. Mannan suffers from obesity and an arthritic condition in his right hip. In July 2017, Mr. Mannan had begun to experience pain in his hip that substantially limited his ability to stand, walk, bend and crouch, and climb stairs – all duties that his position as Correctional Officer required him to perform. His doctor recommended hip replacement surgery and also advised Mr. Mannan that he should lose some weight prior to any such surgery to increase the chances that the surgery would be safe and effective. On July 6, 2017, Mr. Mannan's doctor completed a CDOC Fitness to Return Certification ("FTR") which (despite its title) reported to CDOC particular physical restrictions placed upon Mr. Mannan. From July 1, 2017 to August 1, 2017, Mr. Mannan was restricted to no bending, kneeling, and crawling; no standing or walking for

more than 1 hour per day; and no work in situations where Mr. Mannan would be exposed to an "assaultive, physical control, or arrest situation," among others.

CDOC advised Mr. Mannan that it had no available work that met those restrictions. Mr. Mannan returned to his doctor, and on July 13, 2017, filed a new FTR certification, this time imposing restrictions that would apply from July 13 to August 13, 2017. The new restrictions only limited Mr. Mannan to avoiding continuous standing in excess of 1 hour at a time and continuous walking for more than 30 minutes at a time. The form noted that Mr. Mannan's doctor was "awaiting [a physical therapy] evaluation to further assess restrict[ion]s."

CDOC maintains a Transitional Duty Program (often known in other workplaces as a "light duty" program) that allows employees with work restrictions to be temporarily reassigned to certain posts during a recovery period. The policy explains that "[t]ransitional duty assignments are temporary and may be reviewed, changed, or discontinued at any time, based on the operational/business needs of the facility/office." Pursuant to that policy, on July 17, 2017, CDOC assigned Mr. Mannan to a post of Control Room Operator until August 13, 2017. The Control Room post was a largely sedentary one. In his deposition testimony, Mr. Mannan described the typical duties of the Control Room Operator assignment:

> Answer the phones, answering the radio, distributing equipment. Anyone comes in, if they need a set of handcuffs, for example, if they need pepper spray, anything like that. If we send someone out on a transport, the [Control Room Operator] will take care of those assignments. They'll get the equipment necessary and hand it out to people requesting it. They will answer the phones. They will answer the radio. They will schedule shifts. If we have deficiencies, if there's not enough people for the oncoming shift, they'll spent their time calling in another employee to fill the shift or getting people to stay over.

Mr. Mannan also testified that the Control Room Operator would "go out to the yard and assist with meals or with med line, whatever comes up." Mr. Mannan explained that the obligation to attend to duties in the yard or the med line was "discretionary" and that "if there's enough staff on the yard," or if operations in the Control Room are particularly busy, the Control Room Operator might be instructed to remain in the Control Room instead. (There are also occasions when Control Room Operators would be required to escort lawyers or other visitors through the facility, although these tasks were time-consuming and primarily assigned to other Corrections Officers. Control Room Operators would be asked to do them only if "you are really short on help.") According to Mr. Mannan, "other staff" handled any duties requiring prolonged standing or walking during his assignment as a Control Room Operator. It appears to be undisputed that CDOC did not have any complaints about Mr. Mannan's performance during the period of his transitional duty assignment as a Control Room Operator.

On or about August 13, 2017, Mr. Mannan submitted another FTR certification from his doctor, imposing the same set of restrictions for another three months, through November 13, 2017. Justin Long, the DRDC Warden, concluded that (unspecified) operational needs would not permit Mr. Mannan to remain in a transitional duty assignment as a Control Room Operator for an additional three months. Thus, on August 23, 2017, Mr. Long notified Mr. Mannan that CDOC would be unable to accommodate his restrictions.

It appears that Mr. Mannan then went on some form of leave. During this time, Mr. Mannan's annual self-defense/control tactics certification expired, and it is undisputed that Mr. Mannan did not renew it. (It is not clear whether, given Mr. Mannan's physical condition or his status as being on leave, he was even capable of renewing the certification.) Because Warden

4

Long required this certification of all Correctional Officers, regardless of their posting, the expiration of the certification made it impossible for Mr. Mannan to perform any Correctional Officer duties thereafter.[1]

On or about November 6, 2017, with his prior FTR certification expiring in a few days, Mr. Mannan produced a new FTR certification that maintained the existing restrictions on his work for an additional 90 days – that is, until February 6, 2018. The doctor wrote that Mr. Mannan is "currently being eval[uated] by ortho – doing treatments and medications." Mr. Long responded that CDOC had not positions that could accommodate those restrictions.

On January 22, 2018, CDOC notified Mr. Mannan that he had exhausted his accumulated leave and other benefits and scheduled a meeting to discuss his continued employment. At that meeting, CDOC advised Mr. Mannan that he could make a request for an accommodation under the Americans With Disabilities Act ("ADA"). Mr. Mannan did so, requesting a sedentary position with minimal requirements for standing and walking, and indicating that he wished to remain in the Denver metropolitan area.

---

[1] Mr. Mannan testified that (apparently under a prior warden) there were circumstances where Corrections Officers' self-defense/control tactics certifications expired and that they were allowed to continue working in housing units. It is clear from his testimony that Mr. Mannan lacked personal knowledge as to whether these officers' certifications had indeed expired, and Mr. Mannan was relying solely on the fact that someone told him so. Because Mr. Mannan relies upon these officers' statements for the truth of their content – that the officers' certifications had actually expired – his recitation of the officers' statements is inadmissible hearsay. Mr. Mannan has not offered affidavits or deposition testimony from any person who states, with firsthand knowledge, that officers whose certification had lapsed were allowed to continue working. In any event, Mr. Mannan concedes that he knows of no such officers who were allowed to continue working with lapsed certifications during Mr. Long's tenure as Warden.

Jennifer Murphy, CDOC's ADA coordinator, canvassed open positions within CDOC to determine whether Mr. Mannan was qualified for any of them. All of the open positions that Ms. Murphy located required some degree of contact with offenders, and pursuant to CDOC protocol, employees having contact with offenders must annually take and pass a specific self-defense and control-point training course. (Mr. Mannan's certification under that training course had expired and it appears that Mr. Mannan's physical restrictions would prevent him from taking the course in 2017 or 2018.) Thus, Ms. Murphy concluded that there were no open positions within CDOC that could accommodate Mr. Mannan's preferences and restrictions. Accordingly, on March 19, 2018, CDOC informed Mr. Mannan that his employment was terminated.

Mr. Mannan then commenced this action. He asserts a single claim: that CDOC's refusal to provide him with an accommodation of reassignment to Master Control duties (ultimately leading to his termination), violated Section 504 of the Rehabilitation Act, 29 U.S.C § 794.

CDOC moves for summary judgment **(# 35)**, arguing that Mr. Mannan cannot establish that he is a "qualified individual with a disability," thus capable of pursuing a Rehabilitation Act claim, because he cannot show that he was capable of performing the essential functions of his position as a Corrections Officer, with or without reasonable accommodation. Separately, CDOC moves to strike Mr. Mannan's proffer of the opinion testimony of his vocational expert, Sherry Young, to the extent that Ms. Young opines that CDOC was capable of providing Mr.

Mannan with a "reasonable accommodation." CDOC contends that this constitutes an impermissible legal opinion.[2]

## ANALYSIS

**A. Standard of review**

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

---

[2] The Court does not ultimately reach the Motion to Strike. In conducting the analysis herein, this Court has considered Ms. Young's opinion in all respects except that limited portion of her ultimate conclusion that a "reasonable accommodation" was possible that constitutes a legal opinion. Because the Court finds that CDOC is nevertheless entitled to summary judgment on Mr. Mannan's claim, the question of whether and to what extent Ms. Young may testify about her ultimate conclusion at trial is rendered moot.

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**B. Merits**

Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). A "qualified individual with a disability" is one who, "with or without reasonable accommodation, can perform the essential functions of the employment position." *Jarvis v. Potter*, 500 F.3d 1113, 1121 (10th Cir. 2007).

The statute expressly provides that "the standards used to determine whether this section has been violated in a complaint alleging employment discrimination [ ], shall be the standards applied under Title I of the [ADA]." 29 U.S.C. § 794(d). Mr. Mannan bears the burden of proving that he was a "qualified individual with a disability." *See Cleveland v. Policy Management Sys. Corp.,* 526 U.S. 795, 806 (1999).

There appears to be no material dispute between the parties that Mr. Mannan could not perform the essential functions of the Corrections Officer position that he held, at least during the relevant time period. He was indisputably unable to perform the requisite standing, walking, stair climbing, and various other physical duties that were required with most postings, and once his self-defense/control tactics certification expired, he was unable to perform in any Corrections Officer posting. Thus, the analysis fast-forwards to the question of whether there was a reasonable accommodation that <u>would</u> allow Mr. Mannan to perform the essential functions of the Corrections Officer position.

But even that question is somewhat orthogonal to Mr. Mannan's arguments here. Mr. Mannan is not contending that he could have resumed performing all the essential duties of a Corrections Officer if he were, say, provided with an assistive device like a cane or a chair or if CDOC converted certain staircases in DRDC to ramps. Rather, Mr. Mannan is contending that CDOC should have accommodated his disability by reassigning him to perform only Control Room Operator duties until such time as his surgery was completed.[3] Although "job

---

[3] Mr. Mannan insists that this was not a period of "indefinite length." The record reflects that Mr. Mannan's ability to return to unrestricted status was dependent upon him having hip surgery, and the decision as when, or even if, to have surgery was Mr. Mannan's alone. Thus, his request for an accommodation would have been for an indefinite duration until such time as Mr. Mannan decided to finally have surgery (if he decided to do so at all). And the record

restructuring" – that is, removing non-essential duties from an employee's job assignments -- is a possible way of accommodating a disabled employee, an accommodation that eliminates essential functions from the job is not reasonable. *Frazier v. Simmons*, 254 F.3d 1247, 1261 (10th Cir. 2001). Thus, Mr. Mannan cannot contend that CDOC was obligated to restructure his Corrections Officer job to remove all but Control Room Operator duties from it, as many of the tasks that would be removed – performing standing and walking while manning other posts, physically responding to altercations with inmates regardless of post -- are indisputably essential to the position of Correctional Officer.

Another potential reasonable accommodation an employer can provide is a transfer of an employee to an open position for which the employee is qualified. *Frazier*, 254 F.3d at 1261. But it is undisputed that Control Room Operator is not a discrete position within CDOC. It is simply one of many posts that persons holding Mr. Mannan's job title of Corrections Officer may be assigned to work on a given day. With the exception of Transitional Duty assignments, discussed below, there is no evidence in the record that any Corrections Officer was assigned to only Control Room Operator duties for a lengthy or on an indefinite basis. Thus, Mr. Mannan cannot show that reassignment to a Control Room Operator position would have been a

---

reflects that Mr. Mannan postponed undergoing surgery for a variety of reasons after it was first recommended in July 2017 – because he had to lose weight first in accordance with his doctor's recommendation, because he lacked money, because he was waiting for approval of short-term disability status, because he was waiting to accrue additional leave time, and so on. For all practical purposes, his need for an accommodation was for an indefinite period.

    Mr. Mannan has tendered an affidavit stating that, had he known that CDOC was concerned about the length of any accommodation, he could have elected to proceed to surgery more quickly. But the record is clear that Mr. Mannan knew as of August 13, 2017 that CDOC was no longer willing to accommodate his disability via assignment to Control Room Operator duties. Yet as late as March 2018, when Mr. Mannan was terminated, he had still given no indication to CDOC that he had decided upon or scheduled a date for his surgery.

reasonable accommodation available to him. And Mr. Mannan has not disputed that Ms. Murphy searched for other open positions within CDOC for which he would be qualified with his restrictions and found none. Thus, the record reflects that there were no open positions to which Mr. Mannan could transfer.

Mr. Mannan's argument is, at bottom, that CDOC should have extended his Transitional Duty assignment longer, perhaps indefinitely. Although employers may choose to provide <u>temporary</u> light duty assignments to disabled employees, neither the ADA nor the Rehabilitation Act "require an employer to create a new position" or "provide a permanent light duty post." *Martin v. Kansas*, 190 F.3d 1120, 1133 (10th Cir. 1999); *Meade v. AT&T Corporation*, 657 Fed.Appx. 391, 396-97 (6th Cir. 2016). A request for an indefinite extension of light-duty status is unreasonable as a matter of law. *Frazier-White v. Gee*, 818 F.3d 1249, 1256 (11th Cir. 2016).

That leaves the question of whether CDOC should have at least accommodated Mr. Mannan by extending his Transitional Duty assignment for the three additional months requested by his doctor in August 2017 (and then again for the additional 3 months requested by his doctor in November 2017). Mr. Long has testified, without dispute, that decisions about whether and how long employees may participate in the Transitional Duty program is subject to his discretion. He testified that he limited such assignments to one month. For example, Mr. Long acknowledged that pregnant female Corrections Officers were sometimes assigned to a control room as an accommodation, but never for more than one month.[4] Mr. Long provided an

---

[4] Mr. Long readily admitted that other Wardens at other CDOC facilities might have different opinions about how long it might be appropriate to allow employees to remain in Transitional Duty assignments, but it is undisputed that CDOC vested him with the discretion to make those decisions for employees at DRDC.

11

extensive explanation of why he exercised that discretion to deny Mr. Mannan a continued 3-month Transitional Duty assignment after Mr. Manna's one-month assignment had ended. He explained that "prolonged placements [of officers in the control room] have a multitude of effects on operational effectiveness and staff culture," giving several reasons: (i) it "does not ensure that the staff member can respond to . . . protect themselves"; (ii) it's "a post that's [traditionally] manned by a sergeant," which Mr. Mannan was not; (iii) "prolonged placement in a control center is not efficient and effective for the operation of the organization": (iv) "it inhibits other staff's opportunity for professional density and professional growth in reference to learning on the job about the control center"; (vi) it "does not put someone where they need to be in reference to providing prosocial modeling for the offender population"; and (vii) that a prolonged placement could breed resentment in other Corrections Officials, as it affects "other staff's ability to see the post, work the post, get off of the floor, get out of interacting with offenders at four-hour intervals[;] when someone is posted in a control center for an extended period of time, all of that is ceased."

Thus, the record reflects that Mr. Long typically allowed Transitional Duty assignments for up to a month, but was resistant to extend them much longer than that due to concerns that

---

Mr. Mannan argues, at some length, that DRDC Wardens prior to Mr. Long allowed other disabled employees to remain in Transitional Duty assignments to the control room for well over one month. The Court has some doubt as to whether Mr. Mannan has provided a sufficient evidentiary basis to support such contentions, relying solely on his own knowledge and observations despite lacking the personal knowledge as to many of the essential characteristics of other employees' assignments. Even so, because the ADA and Rehabilitation Act do not require light duty policies at all, DRDC is free to change the contours of its Transitional Duty policy at any time, so long as it does not do so for the purpose of discriminating against any disabled employee. Mr. Mannan has not alleged that Mr. Long's decision to move DRDC to a much less favorable Transitional Duty policy was made for discriminatory reasons.

operational effectiveness degraded with longer assignments and the risk of staff resentment rose. Neither the ADA nor the Rehabilitation Act confer an <u>entitlement</u> upon employees to a light-duty position, and employers are entitled to place whatever fixed restrictions on how long a disabled employee may occupy such a position they choose, so long as those restrictions are not applied discriminatorily. *See generally Frazier-White*, 818 F.3d at 1256 (employer limited light-duty status to 270 days during a two-year period); *Delgado v. Certified Grocers Midwest, Inc.*, 282 Fed.Appx. 457, 462 (7th Cir. 2008) (eight week limit or, alternatively, "as long as [the employees] were reasonably expected to fully recuperate"). Here, Mr. Long afforded Mr. Mannan the full one-month period on a Transitional Duty assignment that he has afforded to similar temporarily-disabled individuals. Once that Transitional Duty assignment ended, CDOC was not required to renew it – and indeed, has articulated good and undisputed cause for not doing so – and was therefore entitled to assess at that point in time whether Mr. Mannan was able to return to performing the essential functions of a Corrections Officer job. Because he was not, he was not a "qualified individual with a disability" for purposes of protection under the Rehabilitation Act.

Accordingly, Mr. Mannan has not carried his burden of demonstrating that he was a "qualified individual with a disability" for purposes of the Rehabilitation Act. Therefore, his Rehabilitation Act claim fails as a matter of law and CDOC is entitled to summary judgment.

## **CONCLUSION**

For the foregoing reasons, CDOC's Motion for Summary Judgment **(# 35)** is **GRANTED**, and the Clerk of the Court shall enter judgment in favor of Defendant State of

Colorado on Mr. Mannan's claim. CDOC's Motion to Exclude the Testimony of Sherry Young **(# 34)** is **DENIED AS MOOT**.

Dated this 2nd day of February, 2020.

**BY THE COURT:**

_/s/ Marcia S. Krieger_

Marcia S. Krieger
Senior United States District Judge